**E. BESLER & COMPANY, a/c Sickles, Inc., et al.**

**v.**

**UNITED STATES.**

**C.D. 4661; Court No. 72-1-00043 and Protest No. 70/64262, etc.**

United States Customs Court.

June 25, 1976.

Stein & Shostak, Los Angeles, Cal. (James F. O'Hara, Los Angeles, Cal., of counsel), for plaintiffs.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (Joseph I. Liebman and David R. Ostheimer, New York City, trial attys.), for defendant.

RICHARDSON, Judge.

The merchandise the subject of these joint actions, described as Homrich-Internegative Printers and various parts thereof, was imported from West Germany and entered at the ports of Nogales, Arizona, in 1968 and Chicago, Illinois, in 1971. The printers were classified under TSUS item 722.18, as modified by T.D. 68–9, as other enlargers and camera-enlargers at the rate of 13% or 9% *ad valorem* depending upon date of entry. The parts were classified under TSUS item 722.34, as modified by T.D. 68–9, as other parts of any of the foregoing enlargers and camera-enlargers at the rate of 18% or 12% *ad valorem* depending upon date of entry.

It is claimed by plaintiffs that the merchandise should be classified under TSUS item 722.94, as modified by T.D. 68–9, as other equipment specially designed for photofinishing (still pictures), not specially pro-

vided for, at the rate of 9% or 6% *ad valorem,* depending upon date of entry, or, alternatively, under TSUS item 688.40, as modified by T.D. 68–9, as electrical articles and electrical parts of articles, not specially provided for, at the rate of 10% or 6.5% *ad valorem,* depending upon date of entry. Defendant claims that the merchandise should be alternatively classified under TSUS item 722.16, as modified by T.D. 68–9, as other cameras other than fixed focus valued over $10 each at the duty rate of 13% or 9% *ad valorem,* depending upon date of entry.

Leslie G. Ebeling, vice president and general manager of Sickles, Inc., the ultimate consignee and producer and distributor, among other things, of products relating to the duplication of slides and film strips, testified that he is familiar with the imported printers and knows what they are used for, has seen them in use, and that his company sells, assembles, manufactures and services them. He stated that the primary use of the imported printers (3 models, IP 35, junior and intermediate, which vary only in the amount and degree of convenience features) was to make duplicate slides or transparencies from master slides or transparencies onto an unexposed film loaded into the camera head. And the exposed film is then removed from the camera head and processed with chemical baths to develop the latent image. The developed film is either cut and mounted into slides, if it is to be a slide, or allowed to remain in strip form if it is to be a film strip.

The witness explained the manner in which the printers function. The unexposed film is transported from the supply real to a position above the lens and exposed in that position. A light source located in the base of the printer produces illumination. The light shines through a transparent medium known as a slide or transparency. The light is collected by the lens and is then imaged on the exposed film positioned above the lens. No movement of the film takes place during exposure. There are timing devices and electronic devices in the printer which provide the sequencing and timing of the shutter and movements of the film to produce the proper imaging. In normal usage the size of the transparency and the size of the image on the film are the same (the printers can produce a duplicate smaller than the master 4 × 5 down to 35 mm. or larger than the master but limited by the size of the unexposed film).

The witness also testified that the printers are used to make internegatives, that is, to produce negatives from transparencies.

These are the principal uses of the printer according to the witness who testified that they are sold mainly by Sickles, Inc. to professional photofinishers who are desirous of producing duplicate slides, film strips and internegatives.

With respect to electrical aspects of the printer, Mr. Ebeling testified that the camera heads can only be used with other electronic devices incorporated in them. The printers must have an electrical source of power. The light source is an electric light bulb. The film transporting mechanism is electric motor driven. The pressure plate holding the film in a flat position during photographic exposure is electrically operated and uses a solenoid. The film advance motor which moves the film into the exposed side of the take-up is an electric motor. The timer which controls the length of time of exposure of the film to light is electronic. The opening and closing of the photographic mirror shutter is controlled by an electronic solenoid.

The witness also testified at some length to other functions of the printers which may be summarized by reference to functions appearing in sales literature received in evidence as exhibit B1. These other features are: PRINT SLIDES . . . from negatives . . . color or black and white, CROP . . . portion of a transparency as a new slide . . . straighten slides, COLOR CORRECT . . twist a dial to add or change color . . . make tinted slides from black and white, CREATES SPECIAL EFFECTS . . . montage, mask, screen, color mood, dodge, burn-in, etc.

And on the subject of color additional literature received in evidence during the testimony of the witness Ebeling in the form of an instruction manual (exhibit B2, page 10) states:

DIALABLE COLOR FILTER LIGHT SOURCE—the color head represents a unique, continuous filtering device. It has been developed in close consultation with numerous large photofinishing establishments. . . .

And the witness concluded his testimony by stating as follows (R. 78–79):

Q. Mr. Ebeling, the merchandise which is in issue in this case and depicted on Plaintiff's Exhibits 1, 2 and 3, in your opinion, are those devices enlargers?—A. No, sir.

Q. Are they cameras?—A. No, sir.

David Kleiman, owner and president of Kaufman and Favry Co., commercial photographers owning subsidiary companies doing professional and amateur finishing services and art work for slide work presentation through a lettering company, testified that his company owns a model IP 35 Homrich printer and owns approximately 18 enlargers of various types, that the printer is used for duplicating which he explained was high mass production of slides of the same size—one to one. The witness stated that in his opinion the printer depicted in exhibit 1 is not an enlarger, is not a camera, but is a duplicator which is used in photofinishing.

Kendrick O. Richardson, former director of sales development of photofinishing for Eastman Kodak Company, now a columnist for Photo Marketing Magazine, and a consultant for a photofinishing association, testified that he has used an Emby-Homrich printer, has seen them used and is familiar with them. He stated that in his opinion they are for the purpose of duplicating slides, and that he calls them photofinishing equipment for making duplicate slides or for making internegatives. He said they are not cameras, camera-enlargers or enlargers, and that during the years he serviced the photofinishing industry he observed photofinishers having printers such as the imported printers on their premises, observed how they were used, and that to his knowledge they were never regarded as enlargers by the photofinishing trade he solicited.

John R. Grimes, instructor in photography and assistant in all fields of the photographic arts and photography to the director of the Institute of Design at the Illinois Institute of Technology, testified that he has seen the printer depicted in exhibit 1 in operation on one occasion, has manipulated the controls on such a printer so that it performed a cropping operation, a color correction operation, and a special effects operation. The witness testified about a number of machines that performed an enlargement operation, and a reduction operation mentioning by name Honeywell Repronon, and the Bogens Illumitran. He stated that he was familiar with equipment especially designed to print still pictures by reason of having used such equipment and having taught its use, and that some of the items in this category are enlargers, enlarging easels, developing tanks, reels, film hangers, squeegies, driers, and mount presses. And he was of the opinion that the article depicted in exhibit 1 is a motorized copy camera possessing a color head for color filtration.

Plaintiffs contend that the printers are more than cameras, enlargers, or camera-enlargers, and that they were designed for and used as photofinishing equipment. Plaintiffs argue (brief, p. 27):

The article before the Court in this case has as its principal function the duplication of slides and film strips in generally the same dimension, or a reduced dimension, as the original which is duplicated. It can, under certain circumstances and with *modifications*, be made to perform other functions some of which can to a greater or lesser degree be performed also by cameras or enlargers. It is quite clear from the Record that these other secondary and minimal functions are subsidiary to the main purpose of utilizing this equipment which is to duplicate slides and film strips. . . .

Defendant contends that the imported articles are camera-enlargers, and that they are not utilized in the processing and developing of the film, and as such are not photofinishing equipment. Defendant argues (brief, p. 17):

> Defendant submits that the record is clear that the imported devices possess the combined characteristics and capabilities of a camera and enlarger and were therefore properly classified under the tariff provision for combination camera-enlargers. . . .

And defendant also argues (brief, p. 20):

> Plaintiffs' claim that the devices should have been classified under item 722.94, *supra*, as photofinishing equipment is without any foundation. The record does not support such classification, it totally contradicts it. . . .

Plaintiffs also contend that the printer parts and, alternatively, the printers themselves, should be classified under TSUS item 688.40 as electrical articles and electrical parts of articles not specially provided for. Plaintiffs argue (brief p. 28):

> There is ample evidence in this Record, uncontroverted by any evidence offered by defendant, that the Homrich devices in issue operate by and are dependent upon an electrical source of power both to drive the mechanism within the device as well as to provide the artificial light source which is essential to the function of the device. . . .

Defendant contends that the provision for camera-enlargers is a specific provision which takes precedence over the parts provision.

And finally, defendant contends that if the court determines that the imported merchandise was improperly classified under item 722.18, they should be classified alternatively under item 722.16 as cameras because the legislative and judicial history are indicative of a broad and all-inclusive application of the provisions for cameras. Plaintiffs contend that there is no evidence in support of defendant's alternative claim for classification of the devices as cameras.

On the record in this case there is no evidence that the articles described on the invoices as optical printers, are bought or sold as cameras, enlargers or camera-enlargers. There is no evidence that they are used or referred to as cameras, enlargers or camera-enlargers, or that any of their components are used separately as cameras or enlargers. And in the absence of such evidence, no useful purpose is served, in the court's opinion, by mentally dissecting portions of the imported articles and comparing the components first to a camera, and then to an enlarger. Obviously, these articles must be considered for tariff purposes as a whole since that is the way they are imported, identified, and as the record shows, used.

■ Congress has recognized a distinct identity for photofinishing equipment even though possessing attributes common to equipment utilized in other areas of the photographic industry. Thus, in TSUS item 722.64 Congress provided equally for "photographic filters for cameras, enlargers, or *photofinishing equipment.*" (Emphasis added.)

Congress has also recognized that printers are equipment legitimately employed in the photofinishing segment of the photographic arts industry. Thus, in item 722.86 Congress provided specifically for contact printers under the heading "Equipment specially designed for photofinishing (still picture)." Under this heading Congress also contemplated that a substantial part of the photofinishing equipment covered in item 722.94, although not specifically named, would be mechanical or electrical. *Tariff Classification Study,* Schedule 7, page 176. Optical or projection printers are a species of printer which is at the other end of the spectrum from the contact printer. *Photo-Lab-Index,* 20th edition (1961), Carroll, pp. 14–24.06, 14–34.01. And it appears that the only reason the optical printer was not *eo nomine* provided for under this heading as in the case of the contact printer is the likelihood that such a printer could be employed, not as a camera or enlarger, but rather in the printing of motion

picture film, for which equipment Congress made other provisions in item 722.96 at the same basic rate as for miscellaneous photo-finishing equipment.

■ However, the uncontroverted evidence in this case is to the effect that the imported articles invoiced as printers are in fact referred to as vertical optical printers, are mainly sold to and used by professional photofinishers following their importation, are used principally to duplicate and print slides and to make internegatives, and that as to one model featuring a color filtration device, were designed in consultation with some large photofinishing establishments. It is settled law that merchandise is to be classified on the basis of its primary design, construction and function. *Trans-Atlantic Company v. United States,* 471 F.2d 1397, 60 CCPA 100, C.A.D. 1088 (1973); *United Carr Fastener Corporation v. United States (Northern Screw Corp., Party in Interest),* 54 CCPA 89, C.A.D. 913 (1967). As applied to the evidence in this case, such law favors classification of the printers in the manner contended for by plaintiffs. The court, therefore, finds that the printers are electrically powered equipment specially designed for photofinishing still pictures, not specially provided for, within the meaning of TSUS item 722.94 and should be classified under that provision.

■ The foregoing disposes of the claims and counterclaim respecting classification of the printers. As to the parts imported with the printers and in issue here, the record shows that they were assessed under TSUS item 722.34, a provision for other parts of cameras, enlargers and camera-enlargers. The provision in item 722.94 for "equipment" is not broad enough to be inclusive of the parts imported with the printers, in the court's view. But since there is no dispute between the parties concerning the electrical nature of these parts, the defendant contending in effect only that they are electrical instruments, apparatus, and other electrical articles provided for in Schedule 7 (defendant's brief, page 21), the parts should be classified under TSUS item 688.40 as electrical articles and electrical parts of articles, not specially provided for, as contended for by plaintiffs, and the court so holds.

For the reasons stated, the claims of the plaintiffs are sustained and the counterclaim of the defendant is dismissed. Judgment will be entered herein accordingly.